## In Re: Genna

*Winifred H. Jones-Wenger,* for appellants.
*Walter A. Criste,* for Pa. Liquor Control Board.

BROWN, JR., *P.J.,* August 3, 1984—

### FACTUAL BACKGROUND

This matter comes before the court upon appellants' appeal from an order of the Pennsylvania Liquor Control Board (Citation no. 1383) issued May 25, 1983. This court held a de novo hearing on May 1, 1984, on the charges in the citation filed against appellants. The evidence presented was as follows:

Prior to October 28, 1983, Kathrine Elise Genna and Eugene Raymond Genna, d/b/a Genna Distributing Co., (hereinafter referred to as Genna) were the holders of Importing Distributor License no. ID-1275, issued by the Liquor Control Board. Under the Liquor Code, 47 P.S. §101 et seq., an importing distributor licensee may purchase for resale malt and brewed beverages from both in-state and out-of-state manufacturers. Id., section 102.

The instant citation concerns purchases made by Genna of four brewed beverages — Iron City beer; Schmidts beer; Pabst Blue Ribbon beer, and Genesee beer. Genna purchased each of the beers not directly from the manufacturers, but from other importing distributors located within the Commonwealth. Genna purchased each of the beers from a different importing distributor. Genna sold each of the four brands of beer to Goldie's Grille, located in Snow Shoe, Centre County, Pa. Genna's sales invoices for these sales do not contain the address of the purchaser. The parties agree that Snow Shoe is not within the territorial limits proscribed by agreements between the manufacturers and the importing distributors from which Genna purchased the beer.

The Liquor Control Board (hereinafter referred to as the LCB) cited Genna for the following violations:

"1. As a Secondary Importing Distributor, you sold and/or delivered malt or brewed beverages to a licensee located outside the geographical areas assigned by the manufacturers of said products to the Primary Importing Distributors, during the period August 13, 1982 to April 12, 1983.

2. Sales invoices used in the operation of your licensed business failed to show the address of the purchaser as required by Title 40 of the Pennsylva-

nia Code, on or about August 13, 1982 to April 12, 1983." Genna contends (1) it is not required to sell beer subject to the territorial restraints imposed upon the original importing distributor by the manufacturer and (2) it is an industry-wide practice to describe the purchaser on a sales invoice by name only. Based upon the following discussion, we hold that Genna did violate both 47 P.S. §4-431(b) and 40 Pa. Code §9.106.

## DISCUSSION

1. Violation of 47 P.S. §4-431(b)

Section 4-431(b) of Title 47 of the Pennsylvania Statutes Annotated regulates the purchases and sales of malt and brewed beverages by distributors such as Genna. The pertinent parts of that section read as follows:

"(b) . . .

"Except as hereinafter provided, [a distributor's or importing distributor's] license shall authorize the holder thereof to sell or deliver malt or brewed beverages in quantities above specified anywhere within the Commonwealth of Pennsylvania, which, in the case of distributors, have been purchased only from persons licensed under this act as manufacturers or importing distributors, and in the case of importing distributors, have been purchased from manufacturers or persons outside this Commonwealth engaged in the legal sale of malt or brewed beverages or from manufacturers or importing distributors licensed under this article.

"Each out of State manufacturer of malt or brewed beverages whose products are sold and delivered in this Commonwealth shall give distributing rights for such products in designated geographical areas to specific importing distributors, and such importing distributor shall not sell or

deliver malt or brewed beverages manufactured by the out of State manufacturer to any person issued a license under the provisions of this act whose licensed premises are not located within the geographical area for which he has been given distributing rights by such manufacturer: Provided, That *the importing distributor holding such distributing rights for such product shall not sell or deliver the same to another importing distributor without first having entered into a written agreement with the said secondary importing distributor setting forth the terms and conditions under which such products are to be resold within the territory granted to the primary importing distributor by the manufacturer.*

"When a Pennsylvania manufacturer of malt or brewed beverages licensed under this article names or constitutes a distributor or importing distributor as the primary or original supplier of his product, he shall also designate the specific geographical area for which the said distributor or importing distributor is given distributing rights, and such distributor or importing distributor shall not sell or deliver the products of such manufacturer to any person issued a license under the provisions of this act whose licensed premises are not located within the geographical area for which distributing rights have been given to the distributor and importing distributor by the said manufacturer: Provided, That *the importing distributor holding such distributing rights for such product shall not sell or deliver the same to another importing distributor without first having entered into a written agreement with the said secondary importing distributor setting forth the terms and conditions under which such products are to be resold within the territory granted to the primary importing distributor by the manufactur-*

*er*. Nothing herein contained shall be construed to prevent any manufacturer from authorizing the importing distributor holding the distributing rights for a designated geographical area from selling the products of such manufacturer to another importing distributor also holding distributing rights from the same manufacturer for another geographical area, providing such authority be contained in writing and a copy thereof be given to each of the importing distributors so affected." (Emphasis added.)

There are four brands of beer involved — two brands manufactured out of, and two brands manufactured in, Pennsylvania. Each manufacturer sold its beer to an importing distributor, who in turn sold to Genna. The four initial importing distributors were (1) White Distributing Company in Morrisdale, Pa. (selling Schmidts beer); (2) Errigo Distributing Company in Curwensville, Pa. (selling Iron City beer); (3) Clearfield Distributing Company, Inc., in Clearfield, Pa. (selling Genesee beer); and (4) West Side Distributing Company, in Clearfield, Pa. (selling Pabst Blue Ribbon beer). Each of the four initial importing distributors entered into agreements with the manufacturers regarding the geographical area within which they could distribute the beer. The parties herein agree that Goldie's Grille is not within any of the proscribed territories.

With respect to Schmidts and Iron City beers, Genna contends that it is a "tertiary importing distributor" and as such, they are not subject to §4-431(b). In support of their position, they point to the agreement between White Distributing Company and Christian Schmidt Brewing Company which is entitled "Secondary Importing Distributor Agreement". Genna argues that because the manufacturer could not possibly be a secondary importing dis-

tributor, White Distributing Company must be. That would make Genna a "tertiary" distributor. In essence, Genna contends that a distributor may assign itself a label different from the label §4-431(b) assigns that distributor.

With respect to Pabst Blue Ribbon and Genesee beers, Genna admits they are secondary distributors. They contend, however, that the language of §4-431(b) does not require them to distribute beer within the geographical boundaries granted by the manufacturers.

An analysis of §4-431(b) defeats both of Genna's contentions.

Initially, the court notes that the Pennsylvania legislature, by virtue of the 21st Amendment to the United States Constitution, has extremely broad police powers to regulate the liquor industry. Commonwealth Liquor Control Board v. Starr, 13 Pa. Commw. 415, 318 A.2d 763 (1974). One such valid police power is the power to limit by territory the distribution of malt and brewed beverages. See In re: Revocation of importing distributor License no. ID-1250, 72 Sch. L.R. 115, 117 (1976). The legislature's purpose in exercising this power is to provide an easily traceable transaction readily susceptible to observation and control. In determining that Genna is bound by the language of §4-431(b), this court remains mindful of the underlying purpose of that section.

The terms "primary" and "secondary" importing distributors are not expressly defined by the Liquor Code. Therefore, their meaning must be derived from the context in which the legislature has chosen to use them. The language of the statute is clear that a "primary importing distributor" holds certain distribution rights and has chosen to grant those rights to another importing distributor. A "second-

ary importing distributor" is one who has entered into a contract with a primary importing distributor to acquire and hold those rights. Any secondary importing distributor may subsequently become a primary importing distributor when it chooses to convey its distribution rights to another importing distributor. In other words, the labels do not represent or identify an importing distributor's position in a chronological sequence of distribution agreements, but, like the contractual terms "party of the first part" and "party of the second part," they appear to differentiate between two contracting importing distributors.

For instance, when an importing distributor "Y" contracts with importing distributor "X" to acquire the distribution rights for certain brewed beverages, "Y" is a secondary importing distributor. When "Y" subsequently chooses to enter a contract with importing distributor "Z" which grants to "Z" the same distribution rights that "Y" acquired from "X", §4-431(b) regards "Y" as "the importing distributor holding such distributing rights," or the primary importing distributor.

Had the legislature intended the result Genna urges upon us, it would have expressly stated that manufacturers shall contract with "primary importing distributors." The statute, however, makes no such reference. The *only* reference to primary importing distributors is specifically to those importing distributors "holding such distribution rights." Therefore, the statute is clear and unambiguous — *all* distributors who hold distribution rights, regardless of from whom they acquired them, are bound by the constraints of §4-431(b) when they choose to grant those distribution rights to another importing distributor. The only other reference to the word "primary" in §4-431(b) is not in reference to import-

ing distributors, but to suppliers (see the fourth paragraph of that section). Although the terms supplier and distributor obviously convey similar meanings, the legislature is presumed to have intended to draw a distinction. Novicki v. O'Mara, 280 Pa. 411, 124 Atl. 672 (1924).

We hold that §4-431(b) recognizes only primary and secondary importing distributors. The terms "tertiary" and "quaternary" are unwarranted and unnecessary. To hold otherwise, consistent with Genna's contentions, would allow distributors, through strawman transactions, to dissolve those geographical boundaries which have been agreed to by the importing distributor(s) and which the legislature has validly determined will best protect the health, safety and welfare of the people of this Commonwealth. Cf. 1 P.S. §1921 (Legislative intent controls in construing statutes.)

The result of our interpretation and holding is that Genna is a secondary importing distributor bound by the geographical limitations contained in the agreements between each of the four initial importing distributors and the respective manufacturers. This result is supported not only by the language of the statute and the obvious intent of its drafters, but by case law construing the statute and by regulations promulgated pursuant to the statute.

The only appellate case construing §4-431(b) is Commonwealth Liquor Control Board v. Starr, 13 Pa. Commw. 415, 318 A.2d 763 (1974). In Starr, the court held that §4-431 restricts a secondary importing distributor (which Genna is with respect to all four brands of beer) to the designated geographical area assigned to the primary importing distributor by the manufacturer. Id. at 419, 318 A.2d at 766. Other common pleas cases are in accord. See, e.g., In re: Revocation of Importing License, no. ID 1250, 72 Sch. L.R. 115 (1976).

The result in Starr has been affirmed by later de-velopments regarding §4-431(b). The Attorney General of the Commonwealth of Pennsylvania issued an advisory opinion in 1977 advising that not only the *sale* of beverages to a licensee located outside the territorial limits constitutes a violation of the Liquor Code, but the *purchase* by that licensee (whether retail or distributor) also constitutes a violation. The opinion recommended LCB regulations that would provide a system whereby *purchasers* would be on notice of an importing distributor's geographical boundaries, so that they could avoid violations. Attorney General Official Opinion no. 16, dated September 1, 1977. See also 47 P.S. §4-441(e).

Presumably pursuant to that advisory opinion, the LCB promulgated the following regulations in 1978:

"40 Pa. Code §9.96:

"Distribution rights.

"(a) All agreements, franchises, or statements of distribution rights given by any manufacturer or by any importing distributor pursuant to section 441 of the Liquor Code (P.L. 90, no. 21) (47 P.S. §4-441) shall be in writing, and a correct copy thereof shall be permanently maintained on the licensed premises of each party to such agreement, franchise, or statement. The agreement, franchise, or statement of distribution rights shall be open to inspection by authorized representatives of the board at all times.

"(b) Each importing distributor and secondary importing distributor deriving rights of distribution by agreement with any manufacturer or importing distributor shall comply with the following:

"(1) Post and keep posted at all times on the licensed premises of such importing distributor, in a conspicuous place near to the license issued to such importing distributor by the board, a schedule des-

ignating the territorial areas of limits of, or rights vested in such importing distributor by a manufacturer or importing distributor. Moreover, such importing distributor shall furnish to all distributors and importing distributors in his territory to whom he intends to sell a schedule in which the territorial areas of the selling distributor or importing distributor are set forth, and he shall obtain the signatures on a copy of such schedule of all distributors or importing distributors to whom he intends to sell. These signed copies of schedules shall be kept on file in the selling distributor's office or importing distributor's office.

"(2) File with the board a certified copy of each franchise or territorial agreement entered into with a manufacturer or importing distributor.

"(3) File with the board a certified copy of each revised, altered, or modified franchised or territorial agreement revising, altering, or modifying previously existing agreements, within 10 days of execution thereof. . . ."

Additionally, we note that 40 Pa. Code §9.21 requires all licensees transporting beverages to affix to the vehicle their address and license number using letters and numbers four inches in height or larger. As a result of these regulations, any *seller* is on notice of the potential buyer's location and whether or not that location is within the seller's territory. All *buyers* are on notice of the seller's territorial restrictions and whether or not they are within that territory. The clear intention of the LCB in promulgating these regulations is to fully and efficiently fulfill its statutory mandate to trace and control the distribution of malt and brewed beverages. The LCB's power does not disintegrate after the beverages pass into the hands of an initial secondary importing distributor.

Genna has cited to the court a letter dated July 16, 1980, written by Chief Counsel for the LCB. They also cite to the court a letter of opinion by the Attorney General dated October 14, 1981. Both letters lend support to Genna's position. However, opinions of the Attorney General are merely for the guidance of Commonwealth officials acting in their executive capacity. DiNubile v. Kent, 466 Pa. 572, 353 A.2d 839 (1976). Although this court considers such opinions to be, in general, persuasive authority, the two letter opinions cited by Genna are not directly on point and we are unpersuaded by the reasoning contained therein.

The court is aware that our interpretation and holding may be economically or otherwise detrimental to some licensees who will now have to change their practices; however, the legislature has determined that its policy of monitoring the distribution of malt and brewed beverages is in the best interests of the public.

Therefore, we hold that Genna violated 47 P.S. §4-431(b) by selling Iron City, Schmidts, Pabst Blue Ribbon and Genesee beer to Goldie's Grille.

2. Violation of 40 Pa. Code §9.106(b)

The relevant portion of §9.106 reads as follows:

"(b) Sales invoices shall be imprinted or affixed with the name and address of the distributor or importing distributor and shall show the name and address of the recipient of the merchandise, date of sale, number of units, size and type of package, brand name, selling price of the malt or brewed beverages and the net cost to the customer. . . ." The obvious purpose for §9.106(b) is to ensure that importing distributors are observing territorial restrictions. This court is not persuaded by Genna's argument that omitting a purchaser's address is

customary practice. Regardless of what might or might not be customary practice for Genna, or for any, or all, importing distributors, the correct practice is to include the purchaser's address on each invoice, as required by §9.106. The court sees no burden in such a requirement. This court finds that the LCB did not *infer* wrongful or nefarious intent on behalf of Genna when it cited Genna for a violation of §9.106(b). Genna simply failed to comply with the requirements of that section. This court may impose a fine for a violation of those regulations. 47 P.S. §4-471.

## ORDER

And now, this August 3, 1984, it is hereby ordered as follows:

1. The determination by the Pennsylvania Liquor Control Board that Kathrine Elise Genna & Eugene Raymond Genna, d/b/a Genna Distributing Co., violated 47 P.S. §4-431(b) and 40 Pa. Code §9.106(b) is sustained.

2. Kathrine Elise Genna & Eugene Raymond Genna, d/b/a Genna Distributing Co., shall pay a fine in the amount of $450 and costs.

3. This court shall consider Genna's motion for post trial relief (filed in response to this court's opinion and order of July 23, 1984) as an application for reconsideration of this opinion and order.

BROWN, JR., *P.J.*, August 13, 1984—Katherine Elise Genna and Eugene Raymond Genna, d/b/a Genna Distributing Co. (hereinafter Gennas), have filed a motion for post trial relief. The motion was filed on August 2, 1984, following this court's opinion and order, dated July 23, 1984. In our July 23 order, we found Gennas "guilty" of violating §4-431(b) of the Liquor Code and Title 40, §9.106(b) of

the Pennsylvania Code. Because this court believed the proceedings to be quasi-criminal, we also advised Gennas of their post-verdict rights in the July 23 order. Gennas filed the instant motion pursuant to that order. They except to certain findings of fact and conclusions of law made by this court.

We have determined that the language of our July 23 order was inappropriate. An order should have been fashioned pursuant to 47 P.S. §4-471(b). Consequently, this court entered an order on August 3, 1984, vacating the July 23 order and, pursuant to §4-471, entered a new order which "sustained the Liquor Control Board's findings and conclusions. Our August 3 order also declared we would consider Gennas' motion for post trial relief as an application for reconsideration. See 42 Pa. C.S. §5505.

Gennas have not raised any arguments different from those raised in their brief and/or during that de novo hearing. Our August 3 opinion and order is dispositive of defendants' contentions.

### ORDER

And now, this August 13, 1984, defendants' application for reconsideration (captioned motion for post trial relief) is hereby denied.